[Civ. No. 32760. Second Dist., Div. One. May 1, 1969.]

CALIFORNIA FEDERATION OF TEACHERS, AFL-CIO et al., Plaintiffs and Appellants, v. OXNARD ELEMENTARY SCHOOLS et al., Defendants and Respondents; OXNARD EDUCATORS ASSOCIATION et al., Interveners and Respondents.

516

Levy, DeRoy, Geffner & Van Bourg and Victor J. Van Bourg for Plaintiffs and Appellants.

Herbert L. Ashby, County Counsel, and Dorothy L. Schechter, Assistant County Counsel, for Defendants and Respondents.

Johnson & Stanton, Gardiner Johnson, Thomas E. Stanton, Jr., and Marshall A. Staunton for Interveners and Respondents.

FOURT, J.—This is an appeal by California Federation of Teachers, AFL-CIO (hereinafter sometimes called CFT) and Marshall Axelrod, its president; and Ventura County Federation of Teachers, Local 1273, AFL-CIO (hereinafter sometimes referred to as VCFT) and Leona Miller, its executive secretary, from a judgment denying their petition for writ of mandate and determining that they are not entitled to the declaratory relief additionally requested. The CFT and its local affiliate VCFT may sometimes hereinafter be together referred to as the Federation.[1]

The "Petition for Writ of Mandate and for Declaratory Relief" prays for a writ of mandate[2] to require respondents,

[1]Although specific relief is also sought for a more localized affiliate entitled the Oxnard Federation of Teachers (OFT), which appears to have separate standing out of court as the employee organization in the Oxnard Elementary School District affected by the litigation, the designated Federation groups assume by implied consent the authority to represent the OFT. Since no technical objection was raised, we presume that the interests of the OFT coincide with and are properly represented by the Federation, noting that duly authorized members of unincorporated associations have the right to represent the membership of such associations in a representative court action (*Professional Fire Fighters, Inc.* v. *City of Los Angeles,* 60 Cal.2d 276, 283 [32 Cal.Rptr. 830, 384 P.2d 158]; and *International Assn. of Fire Fighters* v. *City of Palo Alto,* 60 Cal.2d 295 [32 Cal.Rptr. 842, 384 P.2d 170].) Moreover, the association with which the OFT and its membership are affiliated is the appropriate party to assert claims of this nature since the association, its affiliates, and the membership are in this respect for all practical purposes identical. (See *National Asso. for the A.C.P.* v. *Alabama,* 357 U.S. 449, 459 [2 L.Ed.2d 1488, 1497, 78 S.Ct. 1163].)

[2]Although appellants request a writ of mandate, it appears from the nature of their allegations and their prayer that, at least insofar as items

Oxnard Elementary School (hereinafter sometimes referred to as the District); Robert Pfeiler, president, and Thomas E. Kane, Mary F. Davis, John B. Marshall and Henry W. Muller, members of the Board of Trustees (hereinafter sometimes referred to collectively as the Board); and S. H. Stewart, District superintendent, to do in essence the following things: (a) to cease and desist from discriminating against appellants, collectively or individually, in violation of any applicable rules or regulations; (b) to cease and desist from interfering with the activities or derogating the position of appellants or any of them; (c) to cure the effect of any public statements by respondents which were intended to have or had the effect of discriminating against or undermining the position of appellants or any of them; (d) to permit appellants to represent members as to grievances, to make presentations, and to meet and confer, each directly with and before respondents; and (e) to employ Leona Miller in an appropriate teaching position.[3]

The second cause of action, joining as plaintiffs and defendants, respectively, the identical parties who appear in the first cause of action as petitioners and respondents, seeks relief by way of a declaration that (a) The Winton Act (Ed. Code, §§ 13080-13088) is invalid and unconstitutional; (b) that the rules and regulations promulgated by respondents (i) to create a negotiating council and (ii) to regulate the dealings between respondents and organizations representing its certificated employees are invalid and unconstitutional;

_____

(a) through (c) above are concerned, they have incorrectly characterized their remedy, which is more appropriately in the nature of a labor injunction (See *Petri Cleaners, Inc.* v. *Automotive Employees etc. Local No. 88*, 53 Cal.2d 455, 462 [2 Cal.Rptr. 470, 349 P.2d 76]). Mandamus is the acceptable remedy to require the Board to perform a ministerial duty or to exercise its discretion and may be appropriate with respect to item (d). (See *Wenzler* v. *Municipal Court*, 235 Cal.App.2d 128, 131-133 [45 Cal.Rptr. 54].) Insofar as Leona Miller's right to employment, the present case is not a circumstance of improper discharge (see *Mass* v. *Board of Education*, 61 Cal.2d 612, 627 [39 Cal.Rptr. 739, 394 P.2d 579]) and neither injunction nor mandamus (traditional, Code Civ. Proc., § 1085 or administrative, Code Civ. Proc., § 1094.5) will compel the Board to exercise its discretionary authority in a particular manner (see *Jones* v. *Oxnard School District*, No. 32970, filed March 11, 1969 [270 Cal.App.2d 587 (75 Cal.Rptr. 836)]; *Nishkian* v. *City of Long Beach*, 103 Cal.App.2d 749, 751 [230 P.2d 156]).

[3] Although the averments of the pleadings purport to establish a claim for relief on behalf of Leona Miller as an individual, she is referred to in the caption solely in her capacity as VCFT representative. No objection having been raised to the joinder of her individual cause of action during the trial, we consider it as though properly raised.

and (c) that appellants, notwithstanding the existence of the District negotiating council, have the right (i) to represent individual members in personal grievances before respondents, (ii) to make presentations directly to respondents, and (iii) to meet and confer directly with respondents.

A "Complaint in Intervention" was filed by the Oxnard Educators Association (hereinafter sometimes referred to as the OEA), James Witherall, its president, and Patrick Drury, chairman of the negotiating council of the District (hereinafter sometimes referred to collectively as the interveners) who were, by stipulation and consent, permitted to intervene. Their complaint names no new parties but alleges that interveners have an interest in defending the validity of the Winton Act and the rules and regulations promulgated by respondents pursuant thereto, and further requests that the court declare that appellants should exercise their rights under the Winton Act through the district negotiating council.

The OEA is an affiliate of the California Teachers Association (hereinafter sometimes referred to as the CTA) and these organizations may be sometimes referred to collectively as the Association.

The trial court concluded that there was insufficient evidence of a threat of conduct or a continuing course of conduct calculated to discriminate or resulting in actual discrimination against or interference with appellants, their members or their activities to warrant the issuance of the requested writ, that there was insufficient evidence that Mrs. Miller was entitled to employment by the District to merit relief, that the Winton Act is valid and constitutional and that the rules and regulations promulgated by the District pursuant thereto are equally valid and proper, that appellants enjoy under the Winton Act the right to represent individual members in personal grievances and to make presentations directly to respondents but that appellants are required to exercise their rights to meet and confer with respondents on matters relating to employment relations and educational objectives through the medium of the negotiating council.

The issue of central significance on this appeal is the validity and constitutionality of the Winton Act, and the contentions of appellants in this regard shall be first considered in the context of the subject matter, history and legislative purposes (See *State of California* v. *Brotherhood of R.R. Trainmen*, 37 Cal.2d 412, 416 [232 P.2d 857]) of this statute. Ap-

pellants contend (1) that the classification of public school employees under the Winton Act constitutes an inappropriate and unreasonable classification prohibited by article I, sections 11 and 12, of the California Constitution; (2) that the Winton Act was drafted and introduced, and its enactment was promoted, by and through the activities of the Association which thus obtained advantageous treatment for its members to the detriment of members of the Federation and/or other organizations of certificated employees; (3) that the Winton Act in fact impairs freedom of association by preventing minority organizations from representing their own members before the Board or other administrative bodies and personnel and by requiring the disclosure of member identity; (4) that the Winton Act impairs freedom of speech and assembly protected by the First Amendment to the United States Constitution, in that it prevents an employee from having an organization of his choice appear for him or represent him for redress of a personal grievance before the Board or other administrative body; and (5) that the several proposed amendments to the Winton Act heretofore introduced by legislators constitute substantial evidence that competent persons acknowledge the invalidity of the Winton Act.

The National Labor Relations Act (29 U.S.C. § 151 et seq.) regulates the employment relations of companies and their employees when such companies are engaged in activities in interstate commerce. The individual states are nonetheless free, under their reserve powers, to impose upon the relationship of employer to employee such restrictions as reasonably may be deemed conducive to the general welfare (Cal. Const., art. XX, § 17½; *Matter of Application of Miller,* 162 Cal. 687 [124 P. 427], affd. 236 U.S. 373 [59 L.Ed. 628, 35 S.Ct. 342]) and such state regulations are valid insofar as they do not conflict with the actual exercise of the power of Congress to regulate commerce and do not place an undue burden upon interstate commerce. (*California* v. *Thompson,* 313 U.S. 109 [85 L.Ed. 1219, 61 S.Ct. 930] ; *Smith* v. *Industrial Acc. Com.,* 26 Cal.App. 560 [147 P. 600].) Accordingly, California in 1933 declared its legislative policy concerning the regulation of employment relations in private industry (Lab. Code, §§ 920 et seq.). The common law policy of the state was codified in Labor Code section 923, revised in 1937, as follows: "Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees.

Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.'' This section guarantees to those employed by a private business purely local in nature and which does not ''affect commerce'' within the meaning of the National Labor Relations Act, that there shall be no interference or restraint by the employer on rights of the workers, and guarantees to private employees the right to organize, to engage in collective bargaining (*Shafer* v. *Registered Pharmacists Union*, 16 Cal.2d 379, 385 [106 P.2d 403]), and to participate in concerted activities to secure legitimate employment benefits. (*Petri Cleaners, Inc.* v. *Automotive Employees etc. Local No. 88, supra,* 53 Cal.2d 455, 469-471.) Labor Code section 923 does not, however, impose upon the employer the legal duty to engage in collective bargaining (*Petri Cleaners, Inc.* v. *Automotive Employees etc. Local No. 88, supra,* p. 474) and it has been judically determined that specific legislation is required to extend to public employees the right to bargain collectively which would ''establish an entirely new system in the field of public employment.'' (*Nutter* v. *City of Santa Monica,* 74 Cal.App.2d 292, 301 [168 P.2d 741]; *City of Los Angeles* v. *Los Angeles etc. Council,* 94 Cal.App.2d 36, 46 [210 P.2d 305]; *State of California* v. *Brotherhood of R. R. Trainmen, supra,* 37 Cal.2d 412, 417, cert den. 342 U.S. 876 [96 L.Ed. 658, 72 S.Ct. 166].)

Since the policy underlying Labor Code section 923 had no necessary application to public employees, who occupy a status in relation to their employer different from that of their private counterparts, separate and distinctive legislative treatment has been accorded the regulation of their employment relations. The Legislature, acceding to the demands of

public employees for a more effective and substantial voice in the determination of the terms and conditions of their employment, has only recently been confronted with the need to reconcile those elements which differentiate the position of public employees relative to their employer from that of private employees. In attempting to formulate statutes to extend to public employees appropriate opportunities to participate in determinations relating to the terms and conditions of their employment, the Legislature has been compelled to reevaluate procedures such as collective bargaining, exclusive representation, and strikes which fulfill a traditional role in private labor negotiations with respect to the appropriateness of their application not only to the public sector generally, but to the wide variety of occupations and professions encompassed within the field of public employment.

The separate treatment of public school system employees under the Winton Act should be viewed in its sociological and historical perspective. It was not the first legislative attempt to govern public employment relations in California but evolved through a series of enactments designed to regulate separately various aspects of public employment. The first of these was the Los Angeles Metropolitan Transit Authority Act of 1957 (Stats. 1957, ch. 547, p. 1609) which extended to employees of the then newly organized Los Angeles Metropolitan Transit Authority the right to form labor organizations and to engage in collective bargaining and was held constitutional in the face of charges of arbitrary classification. (*Los Angles Met. Transit Authority* v. *Brotherhood of R. R. Trainmen,* 54 Cal.2d 684, 694 [8 Cal.Rptr. 1, 355 P.2d 905].) The California Fire Fighters Act (Lab. Code, §§ 1960-1963), which in 1959 extended to the fire fighters the right to self organization to present to their employer grievances and recommendations relating to their working conditions but specifically proscribed to them the policies of Labor Code section 923, was subsequently held constitutional against similar charges. (*Professional Fire Fighters, Inc.* v. *City of Los Angeles,* 60 Cal.2d 276, 287 [32 Cal.Rptr. 830, 384 P.2d 158].)

In 1961 the Brown Act (Gov. Code, §§ 3500-3509) extended to employees of "the various public agencies in the State" (Gov. Code, § 3500) the right to form and to join employee organizations which had as one of their primary purposes the representation of such employees in their relations with the

public agency employer, and to be represented by such employee organizations or to represent themselves individually (Gov. Code, §§ 3501 & 3502), but again Labor Code section 923 was specifically rendered inapplicable. The Winton Act (Ed. Code, §§ 13080-13087) passed in 1965, was patterned upon and is in many respects similar to the Brown Act, and it contains the same limitation with respect to Labor Code section 923. (Ed. Code, § 13088.) It removes from the application of the Brown Act and treats separately the employees of public school systems, both certificated and noncertificated, and declares that its purpose is, inter alia, to provide recognition of the right of public school employees to be represented by organizations in their professional as well as their employment relationships, and "to afford certificated employees a voice in the formulation of educational policy." (Ed. Code, § 13080.) Although the Brown Act was amended in 1968 (Stats. 1968, ch. 1390) to require that the governing body of a public agency should "meet and confer *in good faith*" and should reduce its employment agreements to writing (Gov. Code, § 3505) only the Los Angeles Metropolitan Transit Authority Act, *supra,* has adopted and applied to employees in public service in California the collective bargaining concepts of the National Labor Relations Act or similar state statutes. The California Legislature has clearly been attempting to reconcile by selective innovation the divergent elements inherent in public employer-employee relations including the acknowledged distinctions in the status and obligations of public and private employees, as well as the various occupations and professions represented by public employment.

The feature which principally distinguishes the Winton Act from other legislation enacted for the purpose of regulating the employment relations of public employees is the concept of the negotiating council, to which appellants raise strenuous objections. The negotiating council, ideally composed of appointed representatives of rival employee organizations, is to be created only when there exist among the certificated employees in a single school district two or more employment organizations. The member representation of each organization in the negotiating council is then calculated roughly in proportion to its membership among all certificated employees in the District belonging to employee organizations (Ed. Code, § 13085). The directive of the Winton Act in requiring the formation of negotiating councils in districts with mul-

tiple certificated employee organizations was succinctly summarized by Justice Taylor of the Court of Appeals (*Berkeley Teachers Assn.* v. *Board of Education,* 254 Cal.App.2d 660, 664-667 [62 Cal.Rptr. 515]) as follows: "Like its 1961 predecessor, the Winton Act was designed to strengthen existing tenure, merit or civil service systems and other methods of administering employer-employee relations through the establishment of uniform and orderly methods of communication between employees and the public school employers by which they are employed (Ed. Code, § 13080; cf. Gov. Code, § 3500). The rights of public school employees, their organization and the scope of representation are provided for by sections 13082-13084 of the Education Code . . .[4] which parallel Government Code sections 3502, 3503 and 3504.

"The novel provisions of the statute are sections 13085-13087. Section 13085 effectuates the legislative purpose of affording certificated employees a voice in the formulation of educational policy by providing in its first paragraph that the public school employer shall meet and confer 'with *representatives of employee organizations* upon request *with regard to all matters relating to employment conditions and employer-employee relations,*' and in addition, '*meet and confer with representatives of employee organizations representing certificated employees* upon request *with regard to all matters relating to the definition of educational objectives,* the determination of the content of courses and curricula, the selection of textbooks, and other aspects of the instructional program to the extent such matters are within the discretion of the public school employer or governing board under the law. The de-

---

"[4]Section 13082: 'Except as otherwise provided by the Legislature, public school employees shall have the right to form, join and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations. Public school employees shall also have the right to refuse to join or participate in the activities of employee organizations and shall have the right to represent themselves individually in their employment relations with the public school employer.'

"Section 13083: 'Employee organizations shall have the right to represent their members in their employment relations with public school employers. Employee organizations may establish reasonable restrictions regarding who may join and may make reasonable provisions for the dismissal of individuals from membership. Nothing in this section shall prohibit any employee from appearing in his own behalf in his employment relations with the public school employer.'

"Section 13084: 'The scope of representation shall include all matters relating to employment conditions and employer-employee relations, including, but not limited to wages, hours and other terms and conditions of employment.' "

signation of an administrative officer as provided herein shall not preclude an employee organization from meeting with, appearing before, or making proposals to the public school employer at a public meeting if the employee organization requests such a public meeting.' (Italics added.)

"The first paragraph provides the legislative background for the second, which creates and provides for a negotiating council if more than one employee organization represents certificated employees in the District, as follows: 'Notwithstanding the provisions of Sections 13082 and 13083, in the event there is more than one employee organization representing certificated employees, the public school employer or governing board thereof shall *meet and confer with the representatives of such employee organizations through a negotiating council with regard to the matters specified in this section,* provided that nothing herein shall prohibit any employee from appearing in his own behalf in his employment relations with the public school employer. The negotiating council shall have not more than nine nor less than five members and *shall be composed of representatives of those employee organizations who are entitled to representation on the negotiating council.'* (Italics added.)

"The proviso at the beginning of the second paragraph is an indication that what follows is not in all respects in conformity with the provisions of sections 13082 and 13083 (which appear to limit the scope of representation to employer-employee relations and working conditions) as the negotiating council deals with all 'matters specified in this section,' namely, employment conditions and matters of educational policy. Significantly, the negotiating council does not represent all certificated employees of the District, but is composed of representatives of those employee organizations entitled to be represented on the negotiating council.

"Then follows the sentence which sets forth the statutory formula for determining the number of members of the negotiating council, that employee organizations are entitled to appoint as follows: *'An employee organization representing certificated employees shall be entitled to appoint such number of members of the negotiating council as bears as nearly as practicable the same ratio to the total number of members of the negotiating council as the number of members of the employee organization bears to the total number of certificated employees of the public school employer who are members of*

*employee organizations representing certificated employees. Each employee organization shall adopt procedures for selecting its proportionate share of members of the negotiating council, provided that such members shall be selected no later than October 31 of each school year.* Within 10 days after October 31, the members of the negotiating council shall meet and select a chairman, and thereafter such negotiating council shall be legally constituted to meet and confer as provided for by the provisions of this article. Employee organizations shall exercise the rights given by Section 13083 through the negotiating council provided for in this section.' (Italics added.)

"Section 13086 briefly indicates that public school employees shall not be intimidated, coerced, etc. because of their exercise of the right to represent themselves individually in their employment relations (§ 13082), and section 13087 then provides: 'A public school employer shall adopt reasonable rules and regulations for the administration of employer-employee relations under this article.

" 'Such rules and regulations shall include provision for verifying the number of certificated employees of the public school employer who are members in good standing of an employee organization on the date of such verification, and where a negotiating council is required by Section 13085, for the size of the negotiating council. The public school employer may require an employee organization to submit any supplementary information or data considered by the public school employer to be necessary to the verification of the number of members in an employee organization and such information or data shall be submitted by the organization within 10 days after request, provided that membership lists, if requested, shall not be used as a means of violating Section 13086. In addition, such rules may include provisions for (a) verifying the official status of employee organization officers and representatives, (b) access of employee organization officers and representatives to work locations, (c) use of official bulletin boards and other means of communication by employee organizations, (d) furnishing complete and accurate non-confidential information pertaining to employment relations to employee organizations and (e) such other matters as are necessary to carry out the purposes of this article.' ''

It is to the system and procedures herein-above outlined by the California Legislature that appellants take exception. Appellants have raised objections to the constitutionality and

validity of the Winton Act and the judgment of the trial court on the several specific grounds which follow.

## I. *Declaratory Relief and Statutory Unconstitutionality*

*First,* appellants contend that the Winton Act is invalid since (a) the removal from the general category of public agency employees (Gov. Code, §§ 3500-3509) and separate classification of employees of the "public school systems" (Ed. Code, § 13080) excluding employees of state educational institutions, and (b) the distinctions within the Winton Act between noncertificated and certificated public school employees, and (c) the distinctive treatment of certificated employees by the establishment and use of negotiating councils in those districts having members in multiple employee organizations, each and all create special sub-classifications which bear no reasonable relation to proper legislative objectives, and that hence the Winton Act is discriminatory and improper under sections 11[4] and 21[5] of article I of the California Constitution.

The breadth of the legislative discretion to classify the state's citizens in order to achieve through the enactment of appropriate legislation an objective beneficial to the community as a whole is, however, firmly established. (*City of Sacramento* v. *Swanston,* 29 Cal.App. 212, 216-219 [155 P. 101] ; *Patton* v. *La Bree,* 60 Cal.2d 606, 609 [35 Cal.Rptr. 622, 387 P.2d 398] ; *Professional Fire Fighters, Inc.* v. *City of Los Angeles,* 60 Cal.2d 276, 288 [32 Cal.Rptr. 830, 384 P.2d 158].) The purposes of the constitutional prohibitions relied upon by appellants are coincident in requiring that the laws made applicable to the state's citizenry should be uniform, consistent and harmonious, with no person or class singled out for discriminatory treatment. Concededly a law which confers particular privileges or imposes peculiar disabilities upon an arbitrarily selected class of persons who stand in precisely the same relation to the subject matter of the law as does the larger group from which they are segregated constitutes a special law which is tantamount to a denial of equal protec-

---

[4]California Constitution, article I, section 11: "All laws of a general nature shall have a uniform operation."

[5]California Constitution, article I, section 21: "No special privileges or immunities shall ever be granted which may not be altered, revoked, or repealed by the Legislature; nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens."

tion. The uniform operation of the law does not, however, compel the State to treat each member of its population in precisely the same manner. " 'It is not that all laws shall be universal or general in their application *to the same subjects,* nor is it even that all ''laws of a general nature'' shall be *universal* or general in their application *to such subjects;* but the expression is that these laws ''of a general nature'' shall be ''uniform *in their operation''*—that is, that such laws shall bear equally, in their burdens and benefits, upon persons standing in the same category. . . . To treat one man differently from another man—to deny to one man a privilege extended to another man—is not partiality; it may be a just discrimination; to constitute partiality and the invidious discrimination against which the constitution aims, the denial to another of what is given to one must be made upon substantially the same facts; or to express the idea differently, the denial must be *of the same claim* before accorded.'

''Although, . . . the framers of our present constitution took particular pains to guard against the indiscriminate enactment of laws the effect of which was to operate only upon particular persons or things, still, in the very nature of things, it was and is impossible, in a state, like ours, having a variety of interests calling for diverse kinds of legislation, sometimes antagonistic to each other, and where, therefore, a single rule, universal in its application throughout the commonwealth, would operate as a distinct and positive detriment to the interests of certain localities or certain classes of people, to present a system of laws alike applicable to all of the great variety of conditions in the state. Hence, the framers of the constitution recognized the necessity of laws which, in a sense, would be special so far as their operation was concerned—special in the sense that they applied or were to apply to certain classes of persons or things only to the exclusion of all other classes. It is, therefore, competent for the legislature to pass laws of this character; . . . [and] when such legislation is attacked in the courts, every presumption is in favor of the legislative act. Where, upon the facts legitimately before a court, it is reasonable to assume that there were reasons, good and sufficient in themselves, actuating the legislature in creating the class, though such reasons may not clearly appear from a mere reading of the law, such assumption will be made, and the legislation adopted. To warrant a court in adjudging the act void on this ground, it must clearly appear that there was no reason suffi-

cient to warrant the legislative department in finding the difference and making a discrimination.' " (*City of Sacramento* v. *Swanston*, 29 Cal.App. 212, 216-219 [155 P. 101].)

It is significant in this regard that "Wide discretion is vested in the Legislature in making a classification, and its decision as to what is a sufficient distinction to warrant the classification will be upheld by the courts unless it is 'palpably arbitrary and beyond rational doubt erroneous' and no set of facts reasonably can be conceived that would sustain it." (*Patton* v. *La Bree*, 60 Cal.2d 606, 609 [35 Cal.Rptr. 622, 387 P.2d 398].)

It is generally acknowledged that essential distinctions exist between educational public agencies and general, non-educational public agencies, and for this reason educational agencies have traditionally received separate legislative treatment. (See *Minneapolis Fed. of Teachers, Local 59* v. *Obermeyer* (1966) 275 Minn. 347 [147 N.W.2d 358].) The Education Code accordingly establishes a complete system dealing with the credentials, employment, tenure, leave, salaries, dismissal, retirement, and other employee rights and obligations applicable to public school employees. (Ed. Code, §§ 12901-13777; 24201-24324.) This legislation, separate from statutes relating to state, county and other public agency employees, differentiates certificated employees (Ed. Code, §§ 13101-13575.7) from noncertificated employees (Ed. Code, §§ 13580-13756) in the public school and junior college systems and, consistently, differentiates academic from non-academic employees in the state colleges. (Cal. Admin. Code, tit. 5, §§ 42700-43700.) The principal distinctions between the Brown Act and the Winton Act are the additional terms relating exclusively to employees in the educational field as follows: (1) The Winton Act makes it compulsory, rather than discretionary, for the public agency governing board to formulate rules relative to employment relations; (2) The Winton Act makes it compulsory for local school boards to meet and confer with certificated employee organizations; either directly where there is only one employee organization or through a negotiating council where multiple employee organizations exist in the same district. While no similar provision controls the relations between governing boards and academic or certificated employee organizations in other state educational institutions: (3) The Winton Act requires that the local school board shall meet and confer on educational objectives and instructional

programming either directly or through the negotiating council in case multiple certificated employee organizations exist in the district; and (4) The Winton Act requires that the board shall similarly meet and confer on the terms and conditions of employment again either directly or through a negotiating council where multiple organizations of certificated employees exist in a single district. The formation and use of a negotiating council is not required of employees of state educational institutions or noncertificated employees of public school systems.

Insofar as the distinctive treatment accorded to certificated personnel as compared to noncertificated personnel is concerned, since the Winton Act provisions relating to noncertificated employees of public school districts, such as maintenance personnel, parallel substantially identical provisions of the Brown Act applicable to persons employed in similar occupations in other public agencies, the convenience of seperate codification can scarcely be objectionable. Moreover, the separate treatment of public school system employees and employers with respect to employment relations is consistent with the established legislative pattern which logically differentiates various categories of employees in the state educational institutions. State colleges and universities are controlled by the comprehensive master plan of the Donahoe Higher Education Act (Ed. Code, §§ 22500 et seq.) providing, among other things, for the formation of a state academic senate with representatives from each of the state college campuses vested with state-wide responsibility to review educational policies and make presentations to the board of trustees for the state colleges. Further sufficient distinctions justified the differentiation: the state colleges and universities already had rules regulating employment relations; the members of their governing boards were appointed to serve for periods of 10 or more years; the academic employees of these institutions were not required to have state credentials and their terms of employment customarily have been fixed by administrative regulation. (Ed. Code, §§ 13261-13340, 13401-13470, 13501-13520, and 24201.) In contradistinction, most school boards prior to the Winton Act established no rules controlling employment relations; local board members were elected locally to serve for relatively short periods, generally not over one year; the certificated employees of public school systems were required to have state credentials; and the terms of their

employment were regulated and controlled by statute. (Ed. Code, §§ 13101 et seq.)

Appellants claim that the creation and use of the negotiating council in districts where multiple certificated employee organizations exist is discriminatory since multiple employee organizations representing noncertificated employees within a single school district may continue to meet and confer directly with the employer without the intercession of a negotiating council. It may not be presumed, however, that the classification results in discrimination and significant distinctions are prima facie apparent. Initially, the subject matter as to which employer and employee shall meet and confer is different since noncertificated employees are concerned primarily, if not exclusively, with the terms and conditions of their employment while certificated employees have an acknowledged concern with educational objectives and instructional programming as well. On this account, the characteristics of the certificated employee organizations are also somewhat different from those of the organizations which represent noncertificated employees, and teachers may for legitimate reasons desire to belong to more than one employee organization. The negotiating council is designed to utilize most efficiently the lay school board's time and minimize confusion by reducing to the essentials of greatest merit the fragmented interests of certificated employees and the broad subject matter encompassed by their economic and professional goals. The concept is founded on the sound assumption that the reconciliation of interorganizational disputes between multiple employee organizations espousing divergent viewpoints could thus be encouraged and harmoniously achieved. The legislative attempt to establish a practical system, more effective and efficient than either that which required the governing board to negotiate with each of several employee organizations or that which would impose the restrictive concept of exclusive bargaining with the relevant majority to the rejection of minority considerations, is meritorious. "If any state of facts can reasonably be conceived which would support a classification made by the Legislature, the existence of that state of facts is presumed, and one who challenges the classification has the burden of showing that it is arbitrary. [Citations.]" (*Los Angeles Met. Transit Authority* v. *Brotherhood of R. R. Trainmen*, 54 Cal.2d 684, 694 [8 Cal.Rptr. 1, 355 P.2d 905].) "Of course, the authority and duty to ascertain the facts

which will justify class legislation lies with the Legislature and not with the courts [citation] and the Legislature is vested with a wide discretion in adopting classifications to which any particular statute is made applicable [citations], and every presumption is in favor of its validity [citations]." (*Professional Fire Fighters, Inc.* v. *City of Los Angeles* 60 Cal.2d 276, 288 [32 Cal.Rptr. 830, 384 P.2d 158].)

The Winton Act is constructed upon the premise that all groups concerned with the subject matter (teachers and other school employees as well as administrators and school board members) are genuinely and primarily interested in the welfare of schools and pupils and are willing, given appropriate means, to work harmoniously in order to secure the legitimate demands of school employees without detriment to the educational institutions. Surely the public school system in and of itself and its certificated personnel in particular, a group of people well educated, motivated and dedicated to work at modest salaries in the rewarding cause of educating the state's youth, constitutes an appropriate classification on the basis of education, training and temperament, to promote and adapt the negotiating council method of employee representation. By requiring certificated employees belonging to competing organizations to exercise representational rights through a negotiating council selected on a proportional basis, the act assures that a clearer statement of majority desires will be presented to the board and minimizes the danger that the board might be tempted to play minority organizations against one another.

*Second,* appellants contend that the conceded fact that the Association developed and supported the enactment of the Winton Act with its purported limitations upon the activities of minority organizations and creation of the negotiating council conclusively establishes that the act is discriminatory, unfair and invalid. It is true, as appellants assert, that the Association enjoys a position of preeminence because approximately 80 percent of California public school teachers are members, but their further claim that the Winton Act assures the self perpetuation of the Association's dominant position through its majority membership representation on the negotiating councils of local school districts is unsupported by the evidence.

It cannot be assumed that the Legislature in enacting the Winton Act had as its ulterior and improper motive the perpetuation in power of a monopoly organization or that it was

subject to the Association's control. The Association, a state-wide professional organization which for a number of years has represented most of California's teachers maintains an office and a registered legislative advocate in Sacramento because it is vitally concerned with legislation affecting the terms and conditions of teacher employment. The Winton Act was proposed by the Association as an initial step toward the establishment and maintenance of sound and stable public school employer-employee relations because many felt that the Brown Act was not working satisfactorily in the public schools. The Brown Act failed to take into account that teachers were interested in the definition of educational objective and policies as well as the economic factors relating to their employment; local school boards sometimes interpreted the terms "meet and confer" to require them merely to listen to a presentation by an employee organization or attempted to evade this obligation entirely on the basis that they did not know with which one of multiple certificated employee organizations they should deal and they occasionally played off one organization against the other to the detriment of all concerned; finally, when it was left to their discretion many school boards failed to promulgate any rules and regulations respecting employer-employee relations.

Moreover, contrary to appellants' contentions, the minority organization is not by the Winton Act deprived either of meeting and conferring as to individual member grievances or of presenting its proposals directly to the school board. Where multiple employee organizations representing certificated employees exist in a single district, both the public school employer and the public school employee organizations are enjoined to negotiate through the negotiating council medium, but the Act does not preclude one of such organizations from presenting proposals directly to the employer even though meeting and conferring on such proposals must be accomplished through the negotiating council. Appellants further claim that the minority employee organization is doomed to virtual extinction as a result of (a) the statutory disablement to deal directly with the school board and (b) the requirement that all matters must be screened by the negotiating council which is not statutorily obligated to make any presentation to the employer, is patently speculative. There is no evidence that the Oxnard negotiating council has in bad faith failed either to consider, to incorporate in its presentations, or to meet and

confer with the board about the ideas and programs of the minority organization. Although the Winton Act does not specify how long the negotiatiog council may hold a proposal espoused and submitted by any single employee organization, or what procedure is to be followed in considering and evaluating the various proposals presented or how the negotiating council shall select the most beneficial program for its conferences with the board, it must be assumed, in the absence of evidence to the contrary, that the negotiating council will subject the recommendations of both the majority and minority organizations to the same process of screening and that it will conduct its activities in an independent, conscientious and unbiased manner.

Finally, appellants improperly characterize the negotiating council as, in effect, an exclusive bargaining agent for the relevant majority selected without the conventional election mechanics including a secret ballot. It has, in fact, been held that election by secret ballot is contrary to the principles of the Winton Act. (*Berkeley Teachers Assn.* v. *Board of Education, supra,* 254 Cal.App.2d 660, 665, hearing den. Cal. Sup. Ct. Nov. 22, 1967.) Appellants' complaint is unjustified because, among other things, if exclusive bargaining were substituted for the negotiating council under existing circumstances appellants would be left entirely without a voice. The system established by the Winton Act extends to appellants the opportunity of having a minority representative on the negotiating council as soon as their organization achieves a small increment in the number of its members.

Clearly, the Winton Act cannot be considered unfair or prejudicial to appellants, nor does it unduly favor its proponents. It must be recognized, as the trial court observed, that "the legislature expected that the employment of this medium for negotiation would effectuate a time saving to the employer in not having to meet and confer separately with two or more employee organizations; would also relieve the employer from having to deal with divergent viewpoints and to perform the difficult task of weighing and resolving inter-organizational disputes . . . ; would eliminate the possibility of an employer playing one organization off against another and coming up with nothing particularly constructive for the benefit of the employees; and, finally, would better facilitate a continuing and result-securing course of conferring compared with what had been experienced in the past under the wide open negotiation program featured by occasional concentrated

campaigns and confrontations generated for the purpose of achieving employment goals. . . ." It is not the duty of the courts to evaluate the wisdom of specific legislation. We must assume that the Legislature expected honest, sincere compliance and earnest consideration by negotiating council members of the minority organization's ideas and programs, and that if the system is abused, the Legislature will amend or repeal the statute. There is no evidence of a continuity of experience from which it may be inferred that the members of any particular negotiating council will or do act in a biased manner, and indeed the rules and regulations of the Oxnard district reveal an attitude of sincerity, fairness and objectivity. The Winton Act may not be declared invalid merely because it establishes a unique or experimental procedure for dealing with employment relations in the public school system.

*Third,* appellants contend that the Winton Act represents an unconstitutional impairment of the rights of individuals to freedom of association and of assembly in violation of the First Amendment to the United States Constitution. They claim that freedom of association is interfered with because (1) the minority employee organization is deprived of the opportunity to present its programs directly to the school board and (2) the names and identities of members of the minority organization are subjected to disclosure so that their affiliation with a cause presumably unpopular with the school administration may be used to prejudice their interests. Appellants assert that potential members may for either of these reasons be discouraged from joining the minority organization.

With respect to appellants' contention that the disclosure of membership identity violates their constitutional rights, we note preliminarily that the Winton Act specifically prohibits interference with or discrimination against employees of employee organizations and the use of membership lists for this or any other improper purpose. (Ed. Code, §§ 13086 and 13087.) The Oxnard School District rules strive further to protect the confidentiality of membership identity in the respective employee organizations by providing for an independent audit to determine negotiating council membership. (Rule 711.5-2(c).) The Winton Act does not fail because it does not specifically require the imposition of a similar method by each district. It is sufficient that the Winton Act as

applied makes provision for reasonable safeguards. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. [Citations.] Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." (*National Asso. for the A.C.P.* v. *Alabama, supra,* 357 U.S. 449, 460-461 [2 L.Ed.2d 1488, 1498] ; *N.A.A.C.P.* v. *Button,* 371 U.S. 415, 430-431 [9 L.Ed.2d 405, 416-417, 83 S.Ct. 328] ; Cal. Const. art. I, § 10; *Greene* v. *Hawaiian Dredging Co.,* 26 Cal.2d 245, 251 [157 P.2d 367].) The enacted legislation in the present case reconciles the interest of employees in freedom of association in minority organizations with the governmental interest in dealing effectively with employer-employee relations in the public school system without unconstitutionally suppressing or jeopardizing individual rights.

Appellants, however, further urge that the specified defects may be remedied by judicial interpretation of the Winton Act (a) to extend to certificated public school employees the right to election by secret ballot of either an exclusive bargaining agent or, alternatively, the members of the negotiating council which is, according to appellants' logic, in effect the same thing; and (b) to allow employee organizations which do not voluntarily affiliate with the negotiating council to meet and confer directly with the employer. Such a construction would emasculate the very thrust and purpose of the Winton Act. The appellate courts of this state have previously determined that secret ballot elections run contrary to the philosophy and tenor of the Winton Act. (*Berkeley Teachers Assn.* v. *Board of Education, supra,* 254 Cal.App.2d 660, 665.) And, as heretofore pointed out, it is only on matters relating to the employer-employee relations of the group and their professional interests in the educational curriculum that appellants are required to proceed through the negotiating council.

Indeed, it runs contrary to appellants' interests as the representatives of a small minority group in the Oxnard District, to urge exclusive representation. It is highly improbable that with so few members appellants would be able to demonstrate any reasonable likelihood of obtaining the right to be exclusive bargaining agents were regularly conducted secret

ballot elections to be held for that purpose. Nonetheless under the rules and regulations of the District the VCFT will qualify for a seat on the negotiating council when it has sufficient members to constitute a major fraction of one-ninth of the certificated employees of the District who belong to employee organizations. Consequently, a minority organization enjoys greater opportunities under the Winton Act than it would under a statute providing for the election of an exclusive bargaining agent where it might, indeed, be denied a voice since ''The employer's duty to bargain with the statutory bargaining agent includes 'the negative duty to treat with no other.' '' (*Labor Board* v. *Jones & Laughlin,* 301 U.S. 1, 44 [81 L.Ed. 893, 915, 57 S.Ct. 615, 108 A.L.R. 1352] ; *Wyckoff Heights Hospital,* 27 N.Y.S. L.R.B. 75, 79, 55 L.R.R.M. 1291.) As a result of this philosophy in the field of private employment ''representation campaigns are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions.'' (*Linn* v. *Plant Guard Workers,* 383 U.S. 53, 58 [15 L.Ed.2d 582, 587, 86 S.Ct. 657].) The legislative goal of statutorily protecting the public school system, employer and employee, from wasteful, highly partisan contests for representation and the attempt to reconcile the differences between employee organizations through a negotiating council of a size practical to permit meaningful discussion does not constitute impairment of freedom of association. The affirmative compulsion for employee organizations to meet with the negotiating council to confer and urge the adoption of their ideas is implicit in the requirement that ''Employee organizations shall exercise the rights given by Section 13083 through the negotiating council provided for in this section.'' (Ed. Code, § 13085.) The Winton Act cannot, therefore, reasonably be construed to permit those organizations of certificated employees which so choose to forego affiliation with the negotiating council and approach the school board directly. The organization which relies on this principle voluntarily forfeits its voice.

*Fourth,* Appellants' claim that the Legislature may not constitutionally abridge the rights of public employees to assemble freely or to petition their employer for redress of grievances constitutes a refusal to acknowledge that the Winton Act in fact permits direct representation before the board in matters relating to individual grievances. Insofar as

appellants base their claim upon the prohibition of the employee organization to present the position of its membership as a whole to the governing board in relation to employment relations or educational objectives, we have earlier determined that the creation and use of the negotiating council does not, either in principle or under the regulations adopted by the Oxnard district, violate any constitutionally protected interests of appellants.

*Fifth,* appellants contend that the fact that several legislative amendments to the Winton Act have since been proposed signifies general recognition among competent persons that the Act is defective and invalid. This contention cannot be sustained. It would be presumptious of this court either to assume that modifications are proposed to obviate statutory unconstitutionality, or to interfere with the legislative prerogative on this basis.

The local public school board, which is traditionally composed of elected interested lay personnel, currently finds itself in a singular position relative to its functions. It must respond on the one hand to its constituents, on the other to its legislative peers, and it is confronted in every direction by organizations of certificated employees which have recently risen to contend for teachers the same rights to self determination of their employment conditions as their counterparts in private industry. The board is, as heretofore mentioned, charged by legislative mandate with conducting the affairs of the local school district according to the comprehensive statutory scheme of regulating salaries, leaves, certification, tenure, and other circumstances affecting teaching personnel. It is elected to determine, elucidate and implement the district's policy considerations and, at the conclusion of general open discussion and the presentation of recommendations, the board is left with the ultimate decision. While giving consideration to the recommendations of the majority as well as the participating minority organizations among its certificated employees, the board must nonetheless continue responsive to the will of the local electorate and the legislative dictates relating to employment conditions and curriculum requirements within this state. Finally, it is by the Winton Act directed to listen and respond to the suggestions of employee organizations and it must tread carefully in its attempt to reconcile all these imperatives in an equitable manner. Clearly, the board in its effort to negotiate these hurdles, is compelled to rely upon the recognition on the part of the dis-

trict's highly educated and trained, certificated employees, that their professional obligation to the community demands of them a high degree of cooperation, responsibility to render continuing services, and to refrain from interference with the essential operation of educational institutions even in times of conflict. It is assumed that certificated personnel, dedicated to their occupational goals, will in good faith participate in whatever statutory procedures may reasonably be established to assure a free exchange of communication, both inter-organizational and between the board and the employee organizations competing within the district.

"Teachers are earnest and devoted people with a high degree of professional training and experience. They know children and what goes on in the classroom and in the learning process. A lay board should make full use of their willingness, and their knowledge and experience in matters of vital concern to both. Their voices should be heard and their recommendations thoughtfully considered. This should be rudimentary in good procedure. If boards and superintendents aren't doing this, they should. The critical question now is this: Is the superimposing of the already outgrown and inadequate industrial bargaining theory and techniques upon this quite different set of conditions the best way to achieve our purposes? Is this the desired spirit and procedure? Is industrial type 'bargaining' the way to select a reader for the third grade, or decide whether to introduce the new math for the eleventh, or whether the class size shall be 22 or 27, or which teacher shall teach in which school? Can't we find a better way, in a different context, to solve difficult professional questions that must be reasoned and analyzed and decided, but not 'bargained' in this ritualistic sense?" (Hatcher, Alexander F. Morrison Lecturer, 42 State Bar J., pp. 50-51.)

The air is stirring with the demands of public employees for recognition and the right to organize in the interests of influencing their employment conditions, and they are entitled to have these demands acknowledged and accorded to them within reasonable statutory bounds and limitations. Our Legislature in its inimitable wisdom has responded to the challenge by evolving the negotiating council, which incorporates provision for representation by appointed members of various minority organizations, in order to encourage the free exchange of ideas and the resolution of internal conflicts

between these novice entries into the labor negotiation arena. It is the aim of such legislation to encourage the peaceful coexistence of employee organizations representing different philosophies and to allow for the voice of dissent, minimizing the coercion of minorities to the majority will. "The Legislature is uniquely able to amass economic data and hold hearings where it can give heed to many representatives of the public besides parties to a controversy." (*Messner* v. *Journeymen Barbers etc. International Union,* 53 Cal.2d 873, 882 [4 Cal.Rptr. 179, 351 P.2d 347].) Having carefully considered the problem of employment relations in the public school systems the Legislature arrived at a sound statutory determination of its tentative solution. This court has, under the circumstances, the duty and obligation to sustain the validity of the statutory scheme and to enjoin upon appellants the responsibility to cooperate and participate in good faith in order to enhance the declared appropriate legislative objectives.

## II *Alleged Discriminatory Conduct*

Insofar as the rights of appellants to relief in the nature of a labor injunction (under their petition for writ of mandate) is concerned, the issues as conceded by all concerned are purely factual. The terms of the Winton Act clearly and specifically proscribe interference with or discrimination against an employee organization or its members or their activities on account of their exercise of the prerogatives of self organization for the promotion of legitimate employment objectives. (Ed. Code, § 13086.) It is preliminarily acknowledged (1) that the CFT, the VCFT, and the OFT are affiliated labor organizations, each of which is a voluntary unincorporated association to which certain certificated employees of the District belong, and that each meets the definition of "employee organization" (Ed. Code, § 13081, subd. (a)); (2) that the OEA, an affiliate of the California Teachers Association (hereinafter sometimes called the CTA) is a voluntary, unincorporated association composed of certificated employees of the District which has as one of its primary purposes representing certificated employees in their relations with the District, and that the OEA and the CTA (hereinafter sometimes together referred to as the Association) each meet the definition of "employee organization" (Ed. Code, § 13081, subd. (a)); and (3) that the Dis-

trict meets the definition of a "public School employer" (Ed. Code, § 13081, subd. (b)).

Although appellants contend generally that the evidence introduced at the trial proves their claims that respondents engaged in specific acts of misconduct with the intent to produce a discriminatory or derogatory effect and with a result in fact detrimental to the interests of the Federation, they have failed to sustain the burden of showing in their briefs that there is no substantial evidence to support the findings of the trial court. ■ "As we have frequently said, it is the general rule on appeal that an appellate court will view the evidence in the light most favorable to the respondent and will not weigh the evidence. ■ An appellate court will indulge all intendments and reasonable inferences which favor sustaining the finding of the trier of fact and will not disturb that finding when there is substantial evidence in the record in support thereof [citation]." (*McCarthy* v. *Tally*, 46 Cal.2d 577, 581 [297 P.2d 981].)

■ "All presumptions usually made by an appellate court in considering appeals apply to a proceeding in mandamus. . . . The judgment is presumed to be correct, and the burden is on appellant to show reversible error. [Citations.]" (*Cosgrove* v. *County of Sacramento*, 252 Cal.App.2d 45, 50 [59 Cal.Rptr. 919].) ■ Appellants in the present case failed completely to prove their averments that the superintendent and the principals in the District interfered with elections to prevent those persons who were also Federation members from attaining Association offices; that respondents waived deadlines for Association members but not for Federation members; that Association representatives were permitted to appear and be heard by the Board with respect to individual member grievances, employment relations and curriculum while Federation representatives were denied similar privileges; and that respondents demanded that appellants proceed in regard to individual member grievances only through the negotiating council. The evidence adduced to prove their allegations of discrimination, derogation and undermining or intimidation of Federation members was meagre. The only three episodes proved were (1) an informal grievance contact by Mr. Whaley, a teacher; (2) a statement made by the superintendent to two Federation members to the effect that he preferred the Association; and (3) certain comments by the Board construed to be disparaging to Leona

Miller including the Board's request that the Federation replace her with another representative. The events constituting these episodes have no substantial merit and fail to establish the existence of a pattern of conduct adverse to appellants upon which the right to an injunction might be based.

First, the school principal threatened to dock Whaley's salary for his failure to attend a session of the Parent Teachers Conference. Whaley arranged for Mr. Skocik, OFT president, and Mr. Harrison, VCFT president, to represent him at the time appointed for a conference with the principal. When they arrived, however, the principal objected to their presence on the basis that he was entitled to be similarly represented. Whaley thereupon agreed to discuss the matter privately and in this manner compromised on an absentee mark without loss of earnings. Since Whaley did not pursue formal, official grievance procedures, rejected an offer to deal with his grievance with representatives of both sides present, agreed to the departure of his selected Federation representatives, and thereafter held with the principal a voluntary private discussion which resulted in an equitable and nondiscriminatory resolution of the affair, no inference can be drawn that Whaley was coerced into foregoing his right to have Federation representation in an individual grievance proceeding.

The second purported case of misconduct occurred when the superintendent, Stewart, made a statement to the effect that the Association was his favorite organization, which is urged by appellants to constitute an act of discrimination against the Federation on the basis that were this attitude to become generally known, teachers would refrain from joining the minority organization in order not to jeopardize their good standing with their superintendent. In fact, Stewart's full statement as related by Mrs. Miller, was that ". . . even though the CTA was his favorite organization he was planning to be, make every effort to be fair to both organizations, and all organizations, in fact, in the Oxnard School District as new superintendent." There was no evidence that this statement was made to persons other than Mrs. Miller and Harrison, the VCFT president, or that Stewart expressed such sentiments officially, publicly, or to any group of teachers. In the context in which it was made it was clear that the comment was made not with intent to intimidate Federation members nor to discriminate against them, but instead with a candid effort to be fair and impartial in the treatment of

employee organizations and, contrary to appellants' allegations, the statement would appear to be encouraging to present or prospective Federation members. The remark relied upon thus implies no threat or indication that Stewart would attempt to influence his subordinates by discriminating against or intimating Federation members, and it discloses no plan to undermine the Federation program or to discourage recruitment.

Finally, appellants rely upon certain circumstances preceding and resulting in the Board's letter to the Federation in which it was strongly suggested that the VCFT should change the identity of the representative sent to Board meetings. Appellants contend that the Board's comments at the meeting where the subject was brought up, the composition of the letter which was written as a consequence of this meeting, and the fact that the letter was sent to the Federation disclose an animosity for the Federation and an opposition to its policies as well as a desire that such policies should not be presented to the Board, and that this action constitutes evidence of discrimination.

The Board on March 15, 1966, held one of its regular public meetings. (Ed. Code, § 966.) Certain letters which had been sent to the Board signed by Mr. Skocik as president of the OFT were discussed. These letters apparently expressed a position antagonistic to the use of the negotiating council and questioned the legality of its formation. One of the Board members expressed the opinion that these letters had been composed or "ghosted" by Mrs. Miller. As the rough minutes of the Board meeting disclose, its members believed that the legitimate purposes of the OFT were being defeated on account of personal animosities which had developed between the members and Mrs. Miller, the Federation representative. It was recommended that in order to restore peace and harmony the Board should direct a letter to the VCFT to suggest that a new and different representative be sent to Board meetings in the hope that with a fresh approach Board members might be better disposed in consideration of OFT presentations. As a consequence, a letter was drafted and sent to the OFT directing to their attention the fact that presentations made by its representative reflected adversely on the Federation's image and suggesting that a change in the OFT representative be considered. The Board expressly stated that: "In this request there is no intent on the part of the board to

interfere with the internal relationships of the organization.''

As the trial court in its memorandum observed, ''[W]e have the factor of the personality clash, rather than an antagonistic feeling against VCFT and its objectives, as the foundation of an attitude of disapproval as to Mrs. Miller. . . . The informal transcription of remarks made at the board meeting (apparently when Mrs. Miller was present) indicates the thinking . . . which led to the writing of the letter requesting consideration of a change of representatives. . . . In all these remarks . . . [there is] nothing to suggest that there was an intent to demean or that there was a demeaning (whether intended or not) of OFT or VCFT or CFT which would reflect against their stature or their worthwhileness in the eyes of their members or potential members.'' Accordingly, the trial court found that the Board did not imply to the public during the March 15th meeting that the VCFT representative, Leona Miller, had misrepresented the Federation's position; that the remarks made by various Board members during that meeting were neither motivated by an intent nor did in fact demean or discriminate against the Federation in the eyes of members or potential members; that such remarks were instigated by Leona Miller's personal characteristics and not by her affiliation with the Federation; that neither such remarks nor the contents of the letter purported to interfere with or dictate Federation policy, or discriminate against the Federation or derogate its position with its membership or potential members or interfere with the internal selection of its officers and representatives. Since there is no substantial evidence in any of the episodes hereinabove related from which a continuing course of conduct or threat thereof discriminating or interfering with Federation activities or membership may be inferred, the trial court properly denied the requested relief.

Appellants finally contend that they are entitled to a writ of mandamus on behalf of Leona Miller to compel the Oxnard Elementary School to reemploy her in an appropriate teaching position because their previous refusal to do so was arbitrary and discriminatory. The requirements for the issuance of a writ of mandate are (1) a clear and present ministerial duty of the respondent District to admit a person to the use and enjoyment of an office to which he is entitled, (2) a substantial beneficial interest of such person in the perform-

ance of that duty. and (3) the lack of any plain, speedy and adequate remedy in the usual course of law. (Code Civ. Proc., §§ 1085 and 1086.) A writ of mandate will be granted only when necessary to protect a substantial right and only when it is shown that substantial damage will be suffered by the party seeking the writ if it is denied. (*Silva* v. *City of Cypress,* 204 Cal.App.2d 374, 376 [22 Cal.Rptr. 453].) Moreover, the right to the writ must be demonstrated by clear, certain, and positive evidence. (*Wallace* v. *Board of Education,* 63 Cal.App.2d 611 [147 P.2d 8].) Although appellants alleged in their petition that Leona Miller had been improperly discriminated against as an individual on account of her Federation affiliation and activity, they were unable to prove that the District had any duty to re-employ Mrs. Miller in preference to other applicants or that the District's act of refusing to rehire her was occasioned by improper motives. The question, one of fact, was properly resolved by the trial court, which denied relief. " 'It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' " (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689].)

 The trial court found on substantial evidence that neither the District, nor the Board or its members, nor the superintendent discriminated against Leona Miller because of her activities on behalf of the Federation, and found further that the reason she was not employed was either nonavailability of a position or her individual personality problem.

The rights of an employee on leave of absence, and the powers and obligations of an employing school district relating to an employee on such leave are controlled by statute (Ed. Code, §§ 13453-13456) which allow the governing board of a school district discretion to grant leaves of absence to certificated employees and to regulate, with certain exceptions not herein relevant, the length of time, payment of salary and other conditions of leave. At the expiration of the leave of absence the employee, unless other arrangements are reached in the meantime, shall be reinstated in the position he held at

the time the leave was granted. (Ed. Code, § 13462.) Accordingly, the Board adopted rules and regulations governing leaves of absence for certificated employees and those effective for the period in question provided that leave would not be granted for more than one school year at a time and would not be extended to a second school year.

Leona Miller on April 8, 1964, while employed by the District as a teacher, requested in writing a leave of absence for the 1964-65 school year. At the conclusion of that year, she informed the District, again in writing, that she did not intend to return the following year, but requested that her personnel file be retained because she would like to return to teaching at some later time. This letter was incorporated in the official minutes of the Board's meeting of March 31, 1965, and her resignation was accepted effective June 18, 1965. From and after that date Leona Miller's leave of absence ceased and her employment relationship with the District was completely severed. An unemployed teacher has neither a constitutional nor a statutory right to employment by any particular school district, and Mrs. Miller, who apparently had not achieved tenure, at no time made formal application for another teaching position.

In mid-April 1966, Mrs. Miller wrote a letter to the District at a time when teachers were in overabundance and all recruiting programs had been cancelled, and inquired as to prospective employment. The District promptly and courteously advised her that no position would be available even in the event she should make a formal application, and Mrs. Miller took no further affirmative steps to seek employment. Although there is evidence that there was at that time no teaching position open, there is additional evidence to support the trial court's finding that, alternatively, Leona Miller's personality conflict with the Board constituted another probable reason for her rejection. The personality conflict, acknowledged by both the Board and Mrs. Miller, constituted a legitimate ground for the Board to exercise its discretion not to reemploy her, and it cannot be said that this action was arbitrary. (*Hollon* v. *Pierce*, 257 Cal.App.2d 468 [64 Cal. Rptr. 808] ; *Board of Education* v. *Swan*, 41 Cal.2d 546 [261 P.2d 261] ; *Matteson* v. *Board of Education*, 104 Cal.App. 647, 655 [286 P. 482].) Although her contacts with the Board incidental to her activities with the Federation may have drawn attention to certain theretofore undisclosed aspects of

Mrs. Miller's personality, there was no evidence that her letter investigating potential employment prospects was acted upon adversely by the Board because she represented the Federation. Although discrimination in hiring on the basis of union activity is as impermissible as firing an employee on that account (*International Assn. of Fire Fighters* v *City of Palo Alto,* 60 Cal.2d 295 [32 Cal.Rptr. 842, 384 P.2d 170]; *International Assn. of Fire Fighters* v. *County of Merced,* 204 Cal.App.2d 387 [22 Cal.Rptr. 270]; *Professional Fire Fighters, Inc.* v. *City of Los Angeles, supra,* 60 Cal.2d 276), no such discriminatory activity is present in this case. Leona Miller was only one of numerous credentialed applicants who were not employed by the District and there was no evidence that persons less qualified than she were in fact hired by the District at that time.

Appellants' contention that discrimination against Leona Miller constituted in principle discrimination against the Federation falls with the adequately supported finding that there was no arbitrary discrimination against Mrs. Miller and no discrimination against her based upon her participation in Federation affairs. The Board did, indeed, admit to the Federation that it was unable to deal objectively with the organization through its chosen spokesman, not because Leona Miller represented the Federation, but because some of her individual personality characteristics adversely affected their dealings. In an effort to avoid inadvertent discrimination in negotiations, the Board suggested the selection of an alternative Federation representative, an eminently sound and acceptable solution for all concerned.

The judgment is in all respects affirmed.

Wood, P. J., and Thompson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 25, 1969. Peters, J., and Mosk, J., were of the opinion that the petition should be granted.